UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


Billy H. McCauley,                                    Case No. 3: 13 cv 2115

        Plaintiff

  v.                                                            MEMORANDUM OPINION
                                                                                     AND ORDER

Dean Mayer, et al.,

        Defendants

This matter is before me on Defendants' motion for summary judgment (Doc. No. 25), Plaintiff's opposition (Doc. No. 27) and Defendants' reply (Doc. No. 30) thereto. This Court has jurisdiction pursuant to 28 U.S.C. § 1331. For the reasons that follow, Defendants' motion for summary judgment is denied.

### BACKGROUND

On September 11, 2012, D.M., a twelve-year old, was walking out of Sailor Middle School and through parked cars in making his way to his mother's car. Upon getting into his mother's car, D.M. reported to his mother he saw a "man with his hand in his pants." (Doc. No. 25-16, p. 20). His mother, A.M., got out of her car and walked to the area her son had been before getting back in her car and reporting the incident to the school crossing guard, Jessica Schutrum. (Doc. No. 25-17, p. 9).

Ms. Schutrum was a fourth grade interventional specialist with the Vermillion School District. According to Ms. Schutrum's notes, A.M. reported:

> "a man in a silver topaz who was backed into the school parking lot
> and was 'playing with himself.' She repeatedly stated that it was

> disgusting while both of her children [in the car] nodded in agreement.  She said that his shirt was lifted up and that you "could see everything."

(Doc. No. 25-5).

Schutrum promptly reported the incident to the principal, Mr. Brian Zeller.  (*Id.*).  Mr. Zeller contacted Corporal Dan Shupe, the school resource officer who was on duty at the high school.  (Doc. No. 25-9 at p. 16).  As Zeller was talking to Shupe, he walked towards a silver gray car, which was described by Schutrum, as it was the only one of that color parked in that area.  (*Id.* at pp. 16-17).  Zeller reported telling Shupe the make and model of the car as well as the license plate on the vehicle.  (*Id.* at p. 19).  Zeller also reported to Shupe that a student had gotten into the car.  From his vantage point, Shupe observed the vehicle, matched up the license plate, ran the license plate and traced it to the plaintiff's wife, who worked at the school.  (Doc. No. 25-10, pp. 11-14).

Shupe did not stop the vehicle because he "needed to gather more information."  (*Id.* at p. 15).  Instead, he returned to the school to speak with the principal and then spoke with D.M. and his mother.  D.M. stated that "he saw a man in a car, his shirt was up over his belly, his shorts were pulled down and he was playing with himself."  (*Id.* at p. 20). D.M. did not describe the suspect or the vehicle to Shupe but did describe the location or area in the school parking lot where the vehicle was located.  (*Id.* at pp. 20-21).  Shupe was then advised by D.M.'s mother that she walked to the vehicle, looked at the man inside and indicated he "just didn't look right."  (*Id.* at p. 23).  When pressed by Shupe about what that meant, she indicated, "his clothes were disheveled."  (*Id.*)

Based upon Shupe's conversations with D.M.and his mother, the location of the vehicle, that this incident took place at dismissal time with staff members in the parking lot, coupled with his experience, Shupe concluded he did not have probable cause to charge the Plaintiff and the incident required further investigation.  (*Id.* at p. 24).  Shupe conceded the connection to the Plaintiff's car was tenuous because it was only identified by A.M. and he was not sure he had the correct suspect.

2

(*Id.* at p. 26).  At this point the investigation was turned over to the detectives as that was the custom in cases of this type.  (*Id.* at p. 27).  Although Shupe took notes of the incident, he stated his notes were later shredded, as this was his custom once his notebook was full.  (*Id.* at p. 18).

A few days later, Shupe met with Sergeant Davis and Corporal Mayer, relaying what was in his notes regarding the investigation at the school.  Shupe prepared his portion of the police report documenting what he learned in his portion of the investigation.  His portion of the report was completed on September 18, 2012.  (Doc. No. 25-5, p. 4).

Ten days after the incident, D.M. was interviewed by Mayer, Davis, and Shupe with his mother, A.M., present.  A school official was also present for the interview.  (Doc. No. 27-1 at pp. 16-17).  At the beginning of the interview, D.M. was told by Davis that his mother had been asked not to interrupt as the officers wanted to know what D.M. observed, to the best of his ability.  (Doc. No. 25-12, p. 3).  Despite this admonition, A.M. interjected comments during the interview without comment by the detectives.

Mayer asked D.M. whether the man's "penis was exposed or not." (*Id.* at p. 9)  D.M.'s response was "[K]ind of." (*Id.*)

Mayer then inquired about the car:

> Detective Mayer:  Yeah.  The car, what kind of – what—
> D.M.:  It looked like a topaz color. (Inaudible.)
> Detective Mayer:  Topaz color?
> D.M.:  Yeah.
> Detective Mayer:  Or a Topaz car?
> A.M.:  That's the – yeah.
> D.M.:  It was kind of a grayish gold.

(*Id.* at p. 10).

3

During the interview, D.M. described the man he saw as old, having a gray beard, wearing a hat, glasses, and having liver spots. (*Id.* at pp. 9-10). He also stated the car windows were down and the driver's side door was "a bit open." (*Id.* at p. 11). D.M. stated that he walked up on the passenger side of the vehicle when he glanced over at the person in the driver's seat and looked directly at the person. (*Id.* at pp. 13-14). D.M. identified the man as wearing blue shorts and a gray shirt, "like a regular t-shirt." (*Id.* at pp. 14-16). The man's car was also backed into a parking spot. (*Id.* at p. 12).

When asked about the license plate, D.M. could only recall the plate having the numbers 2 and 5. (*Id.* at p. 18).

D.M. was presented with a six photos in an array and which included Plaintiff's photo. D.M. was then asked to identify the suspect. (*Id.* at p. 21). D.M. selected a photo other than the Plaintiff's and indicated his confidence level on the identification was 7 on a scale of 1 to 10. (Doc. No. 25-2, p. 14). At the conclusion of the photo lineup and in front of D.M., A.M. offered her unsolicited identification of the Plaintiff from the photos shown to D.M. (Doc. No. 25-12 at p. 25; Doc. No. 25-2 at p. 5).

Mayer's report did not mention D.M.'s reporting the color of the car as "grayish gold," the suspect's liver spots nor that the numbers D.M. recalled as seeing on the license plate did not match those of on McCauley's car. Instead, Mayer's report states, " He [D.M.] described the car as a "topaz" colored car. I asked what color that it. He advised that it is a greyish white color." (Doc. No. 25-2, p. 5).

The report also neglects to include D.M. having reported looking directly at the suspect. However, the report states that after a photo lineup, D.M. selected a photo which was not the suspect, adding, "The car that the subject was sitting in was backed in and would have walked up from behind so it is possible that he [D.M.] did not get a look at the suspects [sic] face." (*Id.*)

4

Mayer and Davis then interviewed the Plaintiff at his home. The Plaintiff agreed he was at the school that day to pick up his grandchild and he agreed he backed in along the sidewalk as he waited for his granddaughter. At that time of this incident, the Plaintiff drove a faded silver Mercury Topaz with the license numbers EOV 8626.

When asked about what his clothing that day, Mayer's report indicates:

> He [Plaintiff] stated that it was a cold morning so he had a sweatshirt on. He stated that it got warm in the afternoon. He stated that when he got to the school it was very warm. He stated that he didn't want to turn on the air conditioner on in the car so he rolled the windows down, open [sic] the car door slightly and rolled his sweatshirt up on his stomach. When asked what kind of lower garment he had on he stated he could not remember.

(Doc. No. 25-2, p. 6). The Plaintiff denied the criminal allegations.

The report concludes with Mayer contacting A.M. by telephone "and she stated that the male did not have a sweatshirt on but instead had a t-shirt on." (*Id.*)

Mayer met with the prosecutor to discuss possible charges regarding this incident. The prosecutor was not told there was an audio recording of D.M.'s interview. Based upon the report and a discussion with Mayer about what was in the report, the prosecutor authorized a charge of public indecency and the Plaintiff was arrested. (Doc. No. 25-2 at pp. 8-9).

At the trial, both sides learned via Mayer's testimony that there was an audio tape of the interview with D.M., his mother, and the investigating officers. (Doc. No. 25-8, pp. 365-66; Doc. No. 25-19, pp. 2-3). Mayer also admitted on cross-examination that the color of the vehicle, as reported by D.M., was different than what Mayer stated in his report. (Doc. No. 25-19, pp 14-15). The jury acquitted Plaintiff of the charge. (*Id.* at p. 199).

On September 24, 2013, Plaintiff initiated this action against Dean Mayer, in his individual and official capacity, and the City of Vermillion. Plaintiff seeks relief as against all Defendants under

42 U.S.C. § 1983 for fabrication of evidence in violation of his Due Process rights under the Fourteenth Amendment.  Plaintiff also asserts a second § 1983 claim against all Defendants for false arrest and malicious prosecution for violations under the Fourth and Fourteenth Amendments.  The last two causes of action, malicious prosecution and false arrest, are asserted against Defendant Mayer alone.

Defendants move for summary judgment on the basis of qualified immunity, that there are no genuine issues of material fact, and they are entitled to judgment as a matter of law.  Plaintiff contends there are genuine issues of material fact which preclude a finding of on the issue of probable cause and require the issue to be submitted to the trier of fact.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323-25.  Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (*quoting* FED. R. CIV. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations.  It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v.*

6

*Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324; *see also Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)). However, "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,'" *Wiley v. U.S.*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact." *Williams*, 154 F. Supp. 2d at 1071. The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999). Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

### QUALIFIED IMMUNITY

Qualified immunity shields "government officials performing discretionary functions… from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Sixth Circuit employs a three-step analysis to determine qualified immunity: first, it must be determined whether a constitutional right was violated; second, whether that right

7

was clearly established at the time such that a reasonable official would have understood that his behavior violated that right; and third, whether plaintiff has alleged sufficient facts to indicate that the alleged conduct was objectively unreasonable in light of the clearly established constitutional right.  *Sample v. Bailey*, 409 F.3d 689, 695-96 (6th Cir. 2005); *Scicluna v. Wells*, 345 F.3d 441, 445 (6th Cir. 2003) (citation omitted).   Once the defense of qualified immunity is raised, the burden shifts to the plaintiff to prove defendants are not entitled to qualified immunity.  *Rodriquez v. Passinault*, 637 F.3d 675, 689 (6th Cir. 2011).

**Due Process-Fabrication of Evidence**

"It is well established that a person's constitutional rights are violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury."  *Gregory v. City of Louisville*, 444 F.3d 725, 737 (6th Cir. 2006), citing *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997), *cert. denied sub nom. City of Florence v. Chipman*, 523 U.S. 1118 (1998).  Moreover, "[t]he knowing use of false or perjured testimony constitutes a denial of due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."  *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989).  In *Gregory*, the Sixth Circuit denied qualified immunity where the forensic expert's failure to disclose exculpatory evidence in her report was deemed a question of fact for a jury.  444 F.3d at 744-45.

A similar situation exists in this case as there are several disputes on issues of material fact which preclude me from rendering a judgment as a matter of law.  The discrepancies between Mayer's report and D.M.'s statements during the September 21, 2012 interview are not insignificant.

During the interview, D.M. stated that the suspect's car was "grayish-gold," but Mayer's report indicated D.M. described the car as "grayish-white" in color.  Also during the interview, D.M. reported that he looked directly at the man in the car so he would be able to identify the suspect.  When presented with a  photo array, D.M. identified a photo of someone other than the Plaintiff

8

with a confidence level of 7 out of 10. Mayer's report indicated that because D.M. approached the car from the rear "it is possible that he did not get a good look at the suspect's face." (Doc. No. 25-2, p. 5).

At his deposition, Mayer testified that A.M. was eager to have the Plaintiff prosecuted. (Doc. No. 25-11 p. 65) Based upon A.M.'s insistence in pursuing charges and his investigation, Mayer met with the prosecutor as he agreed this was a close case. (*Id.* at p. 48). The prosecutor was given the police reports of the incident, the photo array, and a diagram. She met with the detectives for approximately fifteen minutes during which they discussed the particulars of the incident. (*Id.* at pp. 50-55). Mayer testified the prosecutor was not given a copy of D.M.'s audio interview. (*Id.* at p. 53). Mayer's report on this meeting states:

> I met with Prosecutor O'Bryon about possible charges in this case. She reviewed the case and authorized a charge of public indecency, M-2. An affidavit was typed up and reviewed by the prosecutor.

(Doc. No. 25-2 at p. 8).

Mayer acknowledged the discrepancies on cross-examination at Plaintiff's trial:

> Q: How do you get grayish white in this report if you weren't mistake or you weren't misleading?
>
> A: Because I knew what the color the car was.
>
> Q: Exactly. So when you put in our report that D.M. told me topaz is grayish white, you're thinking, oh, my gosh, the kid said grayish gold, I can't put that in there. That's not the color of the car. So you're lying in this report aren't you?
>
> A: No.
>
> Q: What are you doing? Tell me. Is that the truth?
>
> A: It is.
>
> Q: D.M. said it was grayish white. He advised it was a grayish white color. That's a lie, isn't it?

9

> A: No.
>
> Q: D.M. said grayish white when he spoke to you on that date?
>
> A: He said topaz.
>
> Q: He said topaz and you said, I asked what color that is. And he said, in your report he advised it is grayish white. That's a lie, isn't it? You heard the tape yesterday. Just be honest now. That's a lie, isn't it?
>
> A: Yes.
>
> Q: So it's not even a mistake?
>
> A: It is a mistake.
>
> Q: It's a lie. Because you know he didn't say that.
>
> A: Grayish white, grayish gold.
>
> Q: The same color?
>
> A: It's the same color.

(Doc. No. 25-19 pp. 11-12).

On deposition, the prosecutor testified information contained in the audio recording of D.M.'s interview would have been very important in the decision to charge the Plaintiff with public indecency. (Doc. No. 25-13 at pp. 17-21).

Following the trial, Chief Christopher Hartung issued a verbal reprimand to Mayer for failing to provide the prosecutor with the audio interview, which he deemed to be "inexcusable." (*Id.* at p. 25). Hartung testified he considered but did not pursue a charge of perjury against Mayer regarding his testimony as it was his belief that Mayer merely "screwed up." (Doc. No. 27-2, p. 33).

Based upon the record before me, I find material issues of fact as to Mayer's actions regarding this investigation and whether the inaccurate information contained in his report, left unchecked, could have affected the jury's decision. Despite the Defendants' characterization of Mayer's report being less than precise, the discrepancies noted raise material questions of fact which must be presented to the trier of fact for resolution. On this basis, Defendants are not entitled to

10

summary judgment on their qualified immunity arguments as to the claim regarding fabrication of evidence.

Defendant City of Vermillion also requests judgment as a matter of law regarding Plaintiff's claim that it ratified the fabrication of evidence in this case.

A municipality can be liable under § 1983 where the municipality is shown to have caused the constitutional deprivation. One way to establish liability is through ratification of the unconstitutional conduct. A claim of ratification contains two elements: (1) a final municipal policymaker approved of an investigation; (2) that was so inadequate, or failed to punish the responsible party as to constitute ratification of the unlawful conduct. *Gill v. Kovach*, 729 F.Supp. 925, 940 (N.D. Ohio 2010).

As noted by the Sixth Circuit in *Thomas v. City of Chattanooga*, 398 F.3d 426 (6th Cir. 2005), a single incident of misconduct and a failure to investigate does not equate to municipal liability under § 1983. This is because it would collapse "the municipal liability standard into a simple *respondeat superior* standard." *Id.* at 432-33. "[Ev]idence that a municipality inadequately investigated an alleged constitutional violation can be seen as evidence of a policy that would condone the conduct at issue." *Otero v. Wood*, 316 F.Supp.2d 612, 627-28 (S.D. Ohio 2004).

In this case, there is no dispute that Chief Hartung was the policymaker charged with the ability to investigate and discipline. The investigation conducted by Chief Hartung consisted of him talking with Defendant Mayer and Dan Shupe and giving them each a verbal warning. There was no record of this disciplinary action placed in Mayer's file. Mayer does not recall being reprimanded or disciplined by Hartung. In addition, Hartung agreed he did not conduct an investigation according to the parameters of the Vermillion Police Manual. Although it is a close call, Hartung's investigation of Mayer's actions could be viewed by reasonable jurors as sufficiently inadequate so as to constitute ratification of the alleged unconstitutional conduct.

Accordingly, Defendant Vermillion's motion for judgment as a matter of law is denied.

**Fourth Amendment-False Arrest and Malicious Prosecution**

"A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff." *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010) *quoting Voyticky v. Village of Timberlake, Ohio*, 412 F.3d 669, 677 (6th Cir. 2005). An arrest without probable cause violates the Fourth Amendment. Probable cause to arrest "exists when 'the facts and circumstances known to the officer warrant a prudent man in believing that *an offense* has been committed.'" *Mott v. Mayer*, 524 Fed. Appx. 179, 187 (6th Cir. 2013) (emphasis in original), *quoting Miller v. Sanilack Cnty.*, 606 F.3d 240, 248 (6th Cir. 2010). To determine whether probable cause was present requires "examin[ation] [of] [ ] totality of the circumstances" and "'consider[ation] only [of] the information possessed by the arresting officer at the time of the arrest.'" *Everson v. Leis*, 556 F.3d 484, 498 (6th Cir. 2009), *quoting Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008).

The Sixth Circuit acknowledges "a separate constitutionally cognizable claim of malicious prosecution under the Fourth Amendment." *Barnes v. Wright*, 449 F.3d 709, 715 (6th Cir. 2006), *quoting Thacker v. City of Columbus*, 328 F.3d 244, 259 (6th Cir. 2003). Such a claim encompasses the following four elements:

> (1) That a criminal prosecution was initiated against the plaintiff and that the defendant made, influenced, or participated in the decision to prosecute; (2) there was a lack of probable cause for the criminal prosecution; (3) as a consequence of the legal proceeding, the plaintiff suffered a deprivation of liberty apart from the initial seizure; and (4) the criminal proceeding was resolved in the plaintiff's favor.

*Mott*, 524 Fed. Appx. at 186, *quoting Wallace v. Kato*, 549 U.S. 384, 308-09 (2007). "Probable cause to prosecute exists when the facts and circumstances are sufficient to lead a reasonable person to

believe that the accused committed *the particular offense* with which he is to be charged." (*Id.* at 187, citing *McKinley v. City of Mansfield*, 404 F.3d 418, 445 (6th Cir. 2005)).

As I have already noted, both the prosecutor and Mayer acknowledged this was a close case. Chief Hartung also acknowledged that Mayer's failure to give the prosecutor the audio of D.M.'s interview was "inexcusable." The discrepancies already discussed raise facts upon which reasonable persons could come to opposite conclusions. *See United States v. Gaudin*, 515 U.S. 506, 521 (1995) ("The question of probable cause . . . is resolved . . . by the jury when it is one of the elements of the crime of depriving a person of constitutional rights under color of law.") (citations omitted). Therefore, "unless there is only one reasonable determination possible" the issue of probable cause is for the trier of fact. *Everson*, 556 F.3d at 499, citing *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002).

Based upon the record before me and drawing all reasonable inferences in the non-movant's favor, I find that reasonable minds could differ on the issue of probable cause regarding the arrest or prosecution. Therefore, Defendants' motion on qualified immunity as to the second cause of action is also denied.

**State Law Malicious Prosecution and False Arrest Claim against Defendant Mayer**

The latter two causes of action are asserted against Defendant Mayer alone. Under Ohio Rev. Code § 2744.03(A)(6), an employee is entitled to immunity unless their actions or omissions were with "malicious purpose, in bad faith, or in a wanton or reckless manner." *Id.*

Central to both claims of malicious prosecution and false arrest is the lack of probable cause. As the issue of probable cause is a material issue of fact, as discussed in the qualified immunity section above, the same factual issues are relevant to a probable cause determination as to the state law claims. *See Krutko v. Franklin County, Ohio*, 2014 WL 6687143 *9-10 (S.D. Ohio Nov. 26, 2014).

13

As material issues of fact exist regarding Mayer's actions, summary judgment is precluded on the issue of immunity as to the state law claims.

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment (Doc. No. 25) is denied.

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge
